Case No. 18-520 M. L. Johnson Family Properties v. Ryan Zinke et al. Oral Argument not to Exceed 20 Minutes per Side Ms. Cromer for the appellate Good morning. I'd like to reserve five minutes for rebuttal. May it please the Court, my name is Mary Cromer. I'm here on behalf of the appellant's M. L. Johnson Family Properties. What is before the Court here today is a property rights dispute. Our client is comprised of five siblings who grew up on Track 46 and have cared for it their entire lives. They do not want to see it destroyed by strip mining. They own a majority interest in the surface. They do not own the coal beneath. That coal, along with the remaining surface interest, is owned by Premier Elkhorn and its affiliate, Pike Letcher Land Company. The coal is owned under broad form deeds executed at the turn of the 20th century. This case asks the Court to construe SMACRA. SMACRA's second enumerated purpose is to assure that the rights of surface landowners are fully protected from surface mining operations. Congress recognized that the rights of surface owners are most vulnerable when they do not own the coal beneath their land. Therefore, it included subsection B-6 to protect surface owners. The specific legal issue before the Court today is one of pure statutory construction. The construction of subsection C in 1260 B-6 and the meaning of the term the surface-subsurface legal relationship. Surface-subsurface legal relationship is a term of art. It is used nowhere else in the U.S. Code. That term refers exclusively to the specific state laws that govern the construction of the instruments that define the legal relationship between the two estates. Subsection C allows the mineral estate holder to rely on state law for the sole purpose of asserting its implicit state law rights under the severance. In our brief, we present the Court with a textual analysis of SMACRA that demonstrates that the text is plain and there is no ambiguity as to the meaning of C. The district court's reading of C as allowing the mineral holder to rely on any state law vitiates B-6 entirely. According to the district court's reading, C allows the mineral holder to rely on any state law under which it could assert the right to extract. That is an elephant buried in the mouse hole of sub-sub-subsection C. What would be the point of including A or B when ultimately the decision is left to state law? Every state's law would allow a mineral holder to rely on consent of all surface owners or the express terms of the severance. If C allows reliance on those state laws, then A and B don't provide any additional rights or protection. They are mere surplusage. The effect of that is manifest here. As soon as Kentucky thought it might be prohibited from permitting under A, it reissued the permit under C, simply on the basis that consent of all surface owners is not required in Kentucky law. Why would A be surplusage? It would be you would look for the consent of the parties. If you didn't have the consent, then you could look to other state law under C to see whether there was another rationale, right? But we can presume that every state would allow you to rely on consent. So if C says you can rely on any state law, then what more does A provide? If all state laws, and I think that is true, all state laws would allow you to rely on the consent of the surface owners. There's no question about that. So if C says any state law, there's no point to A. It doesn't provide anything additional. That would be a clunky way to get at consent, wouldn't it? I mean, maybe it's a belt and suspenders. Maybe you just make it clear, look, if it's consent, it's consent. You have a contract. You don't have some other private agreement. But C, you know, if we don't have consent, we move on to something else, and that something else is whatever the body of state law would other things that would allow you to do. Well, no. So if you don't have consent, we believe that it does not make sense that you can rely on a state law that says you don't have to have consent of all surface owners. Aren't they our alternatives? I mean, A, B, and C, they all are A or B or C. That's correct. I mean, they're alternatives, so of course they're different. I mean, consent is different than state law. Well, and they are alternatives, and that's sort of the point of what we're arguing, is why have three different alternatives when the alternative of any state law swallows everything else, when it really is the one thing. Even if it's somewhat redundant. I mean, if Congress wants to be somewhat redundant, they can be redundant, can't they? Well, in this instance, it's not redundant. It's actually the opposite. Congress says any state law, we believe that Judge Sipar's ruling is very well argued or very well reasoned that any state, I'm sorry, consent, I'm sorry, let me start over. A says consent of all surface owners. We believe Sipar's reasoning is very well, his opinion is very well reasoned on that point, that it requires consent of all surface owners. So then why jump down to C and have a provision? Because it says or. If you don't have A, you can look at B, or you can look at C. And if you have one of the three, you win, right? You don't need all of them, do you? No, and I'm not suggesting you need all of them. I'm just saying that Congress would not have allowed for reliance on any state law when A and B would be covered under state law anyway. What authority do you have for that? Well, just the authority of statutory construction, that it renders A and B surplusage. There's no point in having A and B if you're going to allow the mineral holder to rely on any state law anyway. Isn't the answer, or at least the answer that's advanced by the coal company, the fact that state law is different from state to state? So it may well be that in Kentucky, this C is the elephant, but it wouldn't be true in another state where you have to have the consent of all the co-tenants under state law. Well, Your Honor, I'd also like the court to consider another support for this argument, and that's to look at what happened. Well, could you answer my question first before we go on to that? And I believe that I am. That's fine. And it's that what happened in the compromise that led to subsection C. If you look at the conference committee report, it's relied on by the government, it's relied on by Premier Alcorn. It talks about the compromise, and it says that there were ten issues that the conference committee was considering. One of those issues was the requirements of surface consent over both federally and privately owned coal. And it sets out what the Senate had and what the House had. The House version had essentially Kentucky's broad form de-dominion. The House version said you look to the conveyance instrument and you look at what the intent of the parties was at the time of the conveyance. The Senate had no such provision, meaning everything was left to state law. So there was a compromise that was struck there. And we believe that that compromise could not have been what Caldwell's reading, the district court's reading of subsection C is, that you rely on any state law. Because otherwise, and there's a canon of construction here, which is Congress does not intend sub salientio to enact statutory language that it has earlier discarded in favor of other language. So we believe that Congress discarded the idea of reliance on any state law when in that compromise between the Senate version and the House version. And so we don't think that under just the facts of how subsection C was crafted that you can read it to say allow reliance on any state law. We only get to that, of course, if we find the text is ambiguous. Well, I think under Chevron 1 you can look at legislative history based on rulings in this circuit. Chevron 1 allows you to look both at the plain language of the text, at the language within the context of the statute, and at the legislative history. How does Chevron or our help you when the federal government is in favor of the decision of Kentucky here? Well, Your Honor, we believe that this is firmly a Chevron 1 case because it's a pure issue of statutory construction. Congress has not left a gap for the regulatory agency to fill here. In fact, this is a particular area of the statute that is not within the regulatory agency's expertise, and that is shown by the proviso in subsection C that says regulatory agencies are not to adjudicate property rights disputes. So these issues involving property rights are not within OSM's expertise. This is not something that Congress left for the agency to fill in. Is their decision as to what this statute means entitled to any administrative deference? I mean, this is an administrative issue. No, Your Honor, we do not believe that there is any entitlement to deference here because we believe this is a Chevron 1 opinion, and in fact there's a case from this circuit, USVPAC, regarding the construction of some of the immigration statutes where this circuit said that because the issue was one of pure legal construction of the statute that the court questioned. It didn't hold, but it questioned whether Chevron even replies. But at the very least, we believe that this is a Chevron 1 case because it's an issue of pure statutory construction. It's about property rights. This is not an issue that Congress left for OSM. This is not a gap that Congress left for OSM to fill, and I think Congress was very explicit in saying this is not something OSM has particular expertise in because it provided that no regulatory authority shall have the authority to adjudicate property rights disputes. And I'd like to move on to the adjudication issue. Congress also included an important proviso in C that is at issue today. Nothing in this act shall be construed to authorize the regulatory authority to adjudicate property rights disputes. The Johnson family's position is that Congress enacted SMCRA to protect small landowners just like them, and subsection A of SMCRA of 1260B6 gives them the right to withhold consent to surface mining. The secretary and the district court assert that subsection C takes away that right. That is a property rights dispute. This property rights dispute was unlawfully adjudicated by Kentucky's issuance of Minor Revision 3. Now, the term property rights dispute must be interpreted broadly to include this dispute over whether SMCRA gives the Johnson family the right to withhold consent to surface mining. Consider the proviso's placement in the context of C. The term is broad. I'm not sure I follow that, though. I mean, there's no question about ownership, right? There's no question about the validity of deeds. There's no question about what you would traditionally regard as a dispute about real property here, is there? No, there's not. And I would say that some of those questions are more properly characterized as property title disputes, a more narrow form that Congress uses in 1257B. But are there any cases that view this property rights dispute provision as broadly as you want to read it? Judge Bertelsman certainly outlined a fairly narrow view of it, didn't he, in his opinion? Yes, he outlined it as individualized matters. And I'll say there's no precedential holding that this court has to consider. There's no binding case on either way. But we will say that as to Judge Bertelsman's characterization of it as individualized matters, there's just no support for that limitation in the text of Smacker. It's just not there. But would it be – so don't we have to ask whether it would be arbitrary and capricious for the ALJ to have said – to have resolved the case then in the face of this? Or is this a legal question? Again, we believe this is a legal question. We believe that this is a statutory construction question. What did Congress mean when it said property rights dispute? We believe that is answered because in Subsection C, it only occurs in Subsection C. It says this applies to the entire Act, but they put it in Subsection C, the section dealing with the rights between the mineral holders versus the rights between the service holders. So we believe that that is exact. Congress recognized that when you have that kind of contest of rights, there's going to be a property rights dispute. And this is just that type of property rights dispute. So why else would Congress have put it there and used that broad language if it was really only referring to whether or not there was fraud, whether the boundary line is correct, those kinds of very individualized, very particularized disputes? So what would the remedy be then? If we said, oh, okay, fine, this is a property rights dispute, then what happens? So there's a process that's laid out in SMACRA that, A, Premier Elkhorn had the burden under 1260A to establish that the application complied with all of SMACRA's requirements. And it also had the duty under 1257B to disclose the pending litigation. And then the regulatory authority was completely prohibited under 1260B from issuing the permit until the dispute was resolved. So given that, it was then on Premier Elkhorn's to go to state court and obtain a final unappealable state court judgment that it could then take to the regulatory authority to complete its permit application to show that it had the right to extract coal in Track 46. But wouldn't they just win under Kentucky? They'd go to state court, then they would win under Kentucky law, right? Well, our clients have a right under SMACRA to the process that requires the applicant to resolve this dispute. And we don't believe the outcome of that process is foretold. Johnson, we're talking about the Johnson case. Kentucky's high court has it ruled on that. On appeal, the Court of Appeals could overturn Johnson on en banc review. It could be overturned by the Kentucky Supreme Court. We have a lot of, you know, it's not before the court. There are a lot of reasons for which Johnson should not be applied. It was not analyzed as a SMACRA case is the big reason. The trouble that I'm having is to say something is a property right dispute doesn't seem to envision the concept that anybody could go to court at any time and get state law changed. So you have the conveyances, there's no dispute about that. You have state law, you don't like it, but nobody's arguing about what the current state of the state law is. So it seems to me that that then converts all of this to a permit dispute, not a property rights dispute. Well, Your Honor, just so our position is that, you know, state law, we shouldn't even be looking at state law. So that's why we went to state federal court, not to state court. But we don't believe that. This would have been removed anyway. You're talking about this case? Right, right. I mean, to us, this is a federal law matter. This is not a state law matter. You shouldn't be looking at state law because. We should never be under C. C doesn't say what it says. This is a consent case. We should not be under C. It's what? It's a consent case? It's a consent case. But if it's not a consent case, you go to C, which does refer to state law. Right, but our position is we should never be under C because this is a consent case. This should all have been decided under A. Kentucky just did this thing where it said, oh, well, wait, we have this state law. I guess I don't quite follow, but all right. If you're out of time, you could use your rebuttal now, or you can save it. No, I'll save it. All right, any further questions at this time? All right. Good morning. Good morning, Your Honors. May it please the Court. My name is Corinne Snow, and I represent the United States. This case boils down to just one question. Was the Office of Surface Mining and Reclamation Enforcement correct that Kentucky had granted a valid state permit to Premier Elkhorn to surface mine? The answer is yes. Before you get to that, do you agree that we have jurisdiction? Yes, Your Honor, we do. So both of you all agree. It's just the Amici and Elkhorn that are suggesting we don't. That's correct, Your Honor. Okay. Okay, thank you. Go ahead. The reason the Kentucky permit was valid here was because Kentucky co-tenancy law is a state law that defines the relationship between the surface and subsurface under SMACRA. And this, as the appellants agree, comes down to just a straight question of statutory interpretation about one 60B6 and more specifically to subsection C. Now, before getting into this statute, if it would be helpful, Your Honors, I can kind of walk through why this does come down to a state permitting decision and why state law matters here, or I can just turn to the text of subsection C. Your choice. So I think just as context, it's helpful to understand that what appellants are really challenging here is the validity of the state permit that the Kentucky cabinet granted. They're just doing so in federal court through a challenge to the termination of the cessation order that the Office of Surface Mining issued. And under federal law, if there's no valid permit to mine, the Office of Surface Mining must issue a cessation order. But as soon as there is a valid state permit to mine, then again, Office of Surface Mining has no discretion in the matter. They have to terminate that cessation order. So everything goes back to the initial permitting decision by the Kentucky cabinet. And because the Kentucky cabinet correctly granted permit modification number three, the Office of Surface Mining was correct in terminating cessation order. The Board of Hearing and Appeals was correct in upholding that decision. The district court was correct in upholding that. And that's why we're asking the district court be affirmed. All of this initially ties back to 1260B6. So where does arbitrary and capricious fit in? Well, Your Honor, the court would be reviewing the decision by both the Office of Surface Mining and the decision by the Office of Hearing and Appeals to uphold that decision because those are both federal agencies. The inquiry is whether or not they were arbitrary and capricious in, one, terminating the cessation agreement and then upholding that decision. Now, we agree that under Chevron step one, there's a clear reading of the statute. We think that all the decision makers below were correct in that reading. And so it's only if this court determines that there is some ambiguity that we would get to Chevron step two and you would just defer at that point to any reasonable interpretation given by those agencies. What do we do with the difference in language between the Kentucky reg and the federal statute in Part C? I don't think that there's anything to worry about in this case, Your Honor. I mean, it says the original instrument upon which you base your right to extract the coal, right? I mean, doesn't that imply that it has to be in that instrument? Well, Your Honor, here, Kentucky has determined that their regulations cannot be more stringent than SMACRA. And SMACRA says that the Kentucky regulations can't be less stringent. So they have to sort of be read as one and the same. And here the inquiry for the court is whether or not the Office of Surface Mining was correct in its review under SMACRA of saying whether or not this was a valid state permit and therefore terminating the cessation order. So to the extent that the court thinks that there is difference between the language, I think the language to focus on is the SMACRA language. So they wouldn't have to comply with the Kentucky regulation? I mean, it's their system, isn't it? It's not that we're saying that they wouldn't have to comply. It's that we're just saying in this situation they are one and the same. But why? Aren't they trying to change the language to match the federal provision right now? So if it doesn't matter, why would they try to change it? So my understanding, Your Honor, is they're doing that to make it more clear that the language means the same thing but that essentially it's the same inquiry or supposed to be the same inquiry at this point anyway. I think either way, either one you're looking at, what the statutes are trying to do and the regulations are trying to do is provide three different avenues for someone who is seeking to service mine to prove that they have that right. And here we're concerned with the third one, which only comes into play when not all the surface owners have agreed to consent and when there's not an express authorization in the conveyance document to do the surface mining. And in that situation, subsection C still authorizes subsurface mining as long as it's in compliance with state law. All of the decision makers involved so far between the Kentucky Cabinet, the Office of Surface Mining, and the Board of Hearing and Appeals, all agreed with the interpretation that we've given here, which is that subsection C allows the consideration of all state law. And we think that's the most natural reading of the statute, and the district court agreed and held that it was the correct reading under Chevron Step 1. But again, even if this court thinks there is some ambiguity as to the scope of the state law that could be considered, then under Chevron Step 2 we'd submit that the same reading that every decision maker has reached thus far would certainly be a reasonable one. But we would defer to the federal administrator's interpretation of a Kentucky reg? Is that how that would work? No, Your Honor. You would be deferring to their interpretation of SMACRA, because what they had to do was ensure that the permit met SMACRA's requirements. But what if I say, you know, this reg means it has to be in the original instrument of severance. If you don't have it there and you don't have consent, then there's not going to be the right to do it. But, I mean, if I think, oh, well, maybe it's ambiguous, am I deferring to somebody here or it's a Kentucky state reg? Right. And so what appellants could have done and initially started doing, I believe, was to challenge the Kentucky Cabinet's decision under the Kentucky regulations. Now what they're doing instead is challenging the reading by the Office of Surface Mining of SMACRA, because the limited federal role in this case was to determine whether or not the validly granted state permit, in fact, complied with SMACRA. As long as it complied with SMACRA, then they had to terminate the cessation order. So that's sort of the narrow inquiry before this court. So the state cabinet decides to issue the permit. Presumably they have read this reg and said, you meet the reg. Now, under federal law, we're just looking at whether there was something valid or invalid about that under the federal statute. So we don't go back and examine whether we thought they were correct in their reading of the Kentucky reg. That's just been done and it's unreviewable at this point. Your Honor, it could be reviewable in a Kentucky state court, but the narrow question before this court is whether or not the Office of Surface Mining was correct in terminating a cessation order, and the cessation order was just based on a review of SMACRA.  Now, here, Kentucky co-tenancy law is a state law that defines the surface-up-surface relationship because it explains what the rights of a subsurface owner are when it has the consent of one but not all of those surface owners. This was exactly the situation here. It was exactly the situation in Johnson v. the Kentucky cabinet, the decision from the appellate court in Kentucky that we've been discussing. And because it clarifies that relationship, it was completely reasonable for the Kentucky cabinet and for every subsequent decision-maker to rely on that decision. I'm just curious, is this the same Johnsons? No, it's not the same Johnsons. It's all the same other parties. And that decision also clarifies the role of the broad form deed amendment in this case and clarifies that Premier Elkhorn was still able to apply to the state court, which is why we think it was completely reasonable to rely on this as a form of state law. Now, appellants have just brought up this, the fact that SMACRA is supposed to protect property rights, which is protect surface-owner rights, which is one of 13 different justifications for the bill or purposes of the law. I note here, Your Honors, that PLLC is also a surface rights owner as well as a subsurface owner. And they are entitled to certain rights, which they've presumably paid to have under Kentucky state law. And one of those rights is the ability to consent over the protection of their co-tenants to surface mining. We don't see, we see these as different avenues of being able to get a permit and not as mutually exclusive. So just because there are certain ways in which a state law might conflict with A or B, we think Congress contemplated that. We think that's what subsection C is all about. Second, the Kentucky cabinet wasn't adjudicating a property rights dispute when it issued the permit, because here there are no property rights in dispute. Here the parties stipulated to who are the owners of the surface of Tract 46. They even stipulated as to the percent ownership in the surface. They stipulated to the fact that PLLC owns the subsurface and was leasing it to Premier Elkhorn. And they stipulated that Premier Elkhorn was seeking its right to surface mining under a 2013 amended right of entry agreement. That agreement specifically allows for all forms of mining. But if somebody, if you're questioning whether somebody has the right to extract minerals from a piece of real property, why, why isn't that a property rights dispute? I mean, the question is whether I can go in and take things out of the real property. How are we not disputing property right? Well here, Your Honor, the appellants aren't even disputing whether or not under Kentucky law there would be a right for one co-tenant to consent over the objection of other co-tenants. All they're really disputing is the interpretation of subsection C. This is a statutory interpretation case, not a property rights dispute. Property rights disputes would be situations where there's uncertainty about the validity of the chain of title, who the owners are, what the property boundaries. But a property rights dispute can involve the interpretation of a statute, can't it? I mean, just because we're talking about what section C means or what a reg means, doesn't mean at the end of the day that this isn't really a dispute about property. Well, but so I think, Your Honor, that reading wouldn't make sense with the way that subsection C is written. The prohibition on adjudicating property rights disputes immediately follows the requirement that the agency has to make a determination on the legal relationship between the surface and subsurface. And so if those two were one in the same, subsection C would be contradicting itself. So Congress had to be contemplating some body of decisions of determinations about the legal relationship between the surface and subsurface that were different from a property rights adjudication in order for subsection C to make sense. And that's why we think that property rights disputes are better understood as all the agencies here in the Kentucky Court of Appeals have defined them as being about the specific nature of the tract and whether or not there was perhaps fraud in a conveyance or uncertainty about whether the right heirs had signed on to something, a number of issues that just aren't presented in this case. Again, we think it's clear from the statute, Your Honor, that, that you could, that these were not a property rights dispute. And we also think it's clear from the statute that you don't need a final appealable state judicial order saying as much, but to the extent that this court is uncertain about what could and could not be considered, we think it's certainly reasonable under Chevron step two to rely on an on-point state court appellate decision in getting there. Finally, Your Honors, the validity of the permit is not impacted by the fact that no pending litigation was disclosed in the permit application. And here I think it's important. Is that a federal, is that a question of federal, is that a Kentucky thing or a federal thing here? So this is a Kentucky thing. So the permit was a Kentucky permit. The disclosure requirement under Kentucky law, or is it under the federal statute? It, it's under the Kentucky regulation as far as I, I am not aware of any federal regulation that likewise required this, but I'm, I'm not entirely sure about that, Your Honor. But here the, either way, the very specific context in question means that it's, it's sort of irrelevant. So this, this was just Premier Elkhorn coming back for its third permit modification after the court had previously held that it couldn't rely on subsection C, or I'm sorry, on subsection A. The prior litigation was entirely about that right of entry under subsection A. And here, the very specific question in the application was whether any right to enter and mine the area as claimed by the applicant was subject to any pending litigation. Because they were coming back for the very first time and seeking a permit under subsection C, which had never been an issue in any litigation, then their answer was correct, that there was no prior or pending litigation on that issue. And as the district court correctly held, even if they did need to disclose this, the error was harmless because the Kentucky cabinet was well aware of the prior litigation about subsection A. Did the Johnson Trust have the, the ability at some point when they were considering appealing the Kentucky decision to challenge the conclusion that the, was eventually the basis of the decision under C, to actually pursue their Johnson argument, try to get Johnson overturned in state court? Your Honor, I think even if this panel upholds and affirms the district court, they still have the option. I'm asking back when this all came about. For whatever reason, as you framed it, they're simply challenging the withdrawal of the cessation order. Could they have challenged the right under state law in state court had they chosen to do so? Yes, Your Honor. And they didn't? I believe they have not, Your Honor. And that sort of gets to the two points that I'd like to make in closings, Your Honors. The first is just the very limited federal role in this case. And the second are the other avenues of relief still available to appellants if this court upholds the district court's determination. At the end of the day, what appellants are, while they are challenging a cessation, a termination of a cessation order from a federal agency, their real qualm is with their co-tenant and the rights of that co-tenant granted to Premier Alcorn. And as the Kentucky State Court held in Johnson v. Kentucky Environmental Cabinet, they can still bring all of their state property rights claims against their co-tenant for waste or ouster or damage or anything else available under state law. But under the federal statutory regime, as soon as the Kentucky Cabinet properly granted Permit Modification 3 and there was a valid state permit that complied with SMACRA, then the inquiry for the Office of Surface and Mining was done and it had to terminate the cessation order. And all of the decisions from the other agencies have followed from that. And that's why district court should be affirmed. Very good. Any further questions? All right. Bottle. Thank you, Your Honors. I'd like to first just clear up one thing for the court. Judge Nalbandian, you had asked about the pending litigation, where that's found. SMACRA 1257B requires the applicant to provide a number of things, the map and a number of things about the property rights and it ends, and whether the right is the subject of pending court litigation. So that's actually found in SMACRA 1257B. B9. And Judge McKeague, to your point about whether we could have tried this in state court and tried to get Johnson overturned there, we could have. However, SMACRA puts the burden on the applicant to demonstrate everything that is necessary for a full and complete application, including the demonstration that the fact of the property rights have been adjudicated and there is no question. And so it was not our duty to go to state court and get a determination. It is actually Premier Elkhorn's duty to do so. So your argument is that because this process, the permit process is not supposed to address property rights, Elkhorn had the duty to file in state court to get – So why would they go to state court to get a federal permitting issue resolved in state court? I understand why you would go to state court to challenge Johnson v. Environmental Cabinet. It's because in the face of an objection, in the face of a dispute, when we file objections to each iteration of the permit, in the face of a dispute, the agency is told to stay at hand until that dispute is resolved. The burden is then on the applicant to resolve that dispute because the applicant has to be able to demonstrate a clear right of entry as part of its application. But what they would have been doing was to go to state court to get a state lower court to say what the Kentucky Court of Appeals had said. Well, I mean, we can play – And they're bound by that. Well, the lower court would be bound, but then we would appeal it to the Court of Appeals, which would not be bound. I mean, this sort of gives the impression, and I'm not saying you had some necessarily ulterior motives here, but it just sounds like that whole argument is a giant stall. No, Your Honor, it's not. We have done everything in our power as quickly as possible to stop this land from being mined. Our clients are passionate about this. Well, you didn't go to state court. What we did was go to federal court. You didn't go to state court, and your answer is, well, we don't have the burden to go to state court. I get that. Well, my answer to your specific question was that. The larger answer is this is a consent issue. This is an issue that is under Subsection A, consent. That subsection gives my clients the right to withhold their consent. This idea that Subsection C has this, you know, elephant, as I described it, that allows reliance on any state law, especially state laws that say, no, you don't have to have consent of all service owners, that only came up later. That was not something – I mean, our position is this is a federal law matter. We have the right to withhold consent. So it would not – you know, it's not – it was not strategic to bring this as a state law case. It was strategic to bring it as a federal law case because that's where our clients are most protected. Thank you. I'd also like to address the issue of the Kentucky regulation. So what the district court and what the administrative law judge essentially said was the Kentucky regulation is the same as SNACRA, even though it has that additional language upon which the applicant relies. So their holding there was, no, it's really the same. There's some additional language, but it's not – it doesn't matter. What I would like the court to consider there is that in 1982, when the Secretary approved Kentucky's program, the Secretary at that time interpreted the federal regulation, 778.15, which has the same subsection C. And the Kentucky – I'm sorry, OSM at that time interpreted that regulation specifically as requiring reliance on the conveyance. And it did that to say Kentucky's regulation is the same. So Judge Schweitzer's, the ALJ's, opinion is directly in conflict with that 1982 decision of OSM. And I don't in any way suggest that you should get to level two deference on that, but there is that conflict that is never explained. There was a change in the agency's position between 1982 and Judge Schweitzer's opinion, and there's no explanation for that other than Judge Schweitzer saying it's a mere summary. I'd also like to talk a little bit more about what the surface-subsurface legal relationship really means and what it meant in SNACRA at that time. It essentially meant that – and I see I'm out of time. Well, you can wrap it up. Okay. It meant that Kentucky was allowed to rely on broad form deeds. It means that states – Montana is the only state now that does this. Montana has a dominance of the mineral estate law. In Montana, you can rely on that dominance of the mineral estate to interpret the conveyance. So that's all subsection C meant was that you could rely on broad form deeds, on state laws that interpret the conveyance. And I think that is supported by the legislative history, the piece of the conference committee report that describes what the Senate had and what the House had and what the compromise was. Any further questions? Thank you. All right. Thank you, counsel. The case will be submitted. Call the next case.